JS 44   (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Christopher Thorpe

**DEFENDANTS**
City of Philadelphia, Commissioner Charles Ramsey, Officer Hosgood, Officer Krawczyk and Jane/John Does

**(b)** County of Residence of First Listed Plaintiff    Montgomery
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Philadelphia
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Prince Law Offices, P.C.
646 Lenape Rd
Bechtelsville PA 19505

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
      Plaintiff

☒ 3   Federal Question
      *(U.S. Government Not a Party)*

☐ 2   U.S. Government
      Defendant

☐ 4   Diversity
      *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*       *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product |    Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument |    Liability | ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & |    Pharmaceutical | | ☐ 820 Copyrights | ☐ 450 Commerce |
|    & Enforcement of Judgment |    Slander |    Personal Injury | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' |    Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and |
| ☐ 152 Recovery of Defaulted |    Liability | ☐ 368 Asbestos Personal | | |    Corrupt Organizations |
|    Student Loans | ☐ 340 Marine |    Injury Product | | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
|    (Excludes Veterans) | ☐ 345 Marine Product |    Liability | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment |    Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
|    of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud |    Act | ☐ 863 DIWC/DIWW (405(g)) |    Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 190 Other Contract |    Product Liability | ☐ 380 Other Personal |    Relations | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal |    Property Damage | ☐ 740 Railway Labor Act | | ☐ 893 Environmental Matters |
| ☐ 196 Franchise |    Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 895 Freedom of Information |
| | ☐ 362 Personal Injury - |    Product Liability |    Leave Act | |    Act |
| |    Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 896 Arbitration |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** |    Income Security Act | ☐ 870 Taxes (U.S. Plaintiff |    Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | |    or Defendant) |    Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ |    Sentence | |    26 USC 7609 |    State Statutes |
| ☐ 245 Tort Product Liability |    Accommodations | ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| |    Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| |    Other | ☐ 550 Civil Rights |    Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | |    Conditions of | | | |
| | |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
     Proceeding

☐ 2   Removed from
     State Court

☐ 3   Remanded from
     Appellate Court

☐ 4   Reinstated or
     Reopened

☐ 5   Transferred from
     Another District
     *(specify)*

☐ 6   Multidistrict
     Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC 1983 and 1988
Brief description of cause:
Violations of 2nd, 4th and 5th Amendments

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*    JUDGE        DOCKET NUMBER

DATE
06/10/2013

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: Christopher Thorpe 7913 Newbold Lance, Laverock Pa 19038

Address of Defendant: City Hall, S. Penn Square Philadelphia Pa 19106

Place of Accident, Incident or Transaction: June 30, 2011

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))　　　Yes☐　No☒

Does this case involve multidistrict litigation possibilities?　　　Yes☐　No☒

*RELATED CASE, IF ANY:*

Case Number: _____　Judge _____　Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
　　　Yes☐　No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
　　　Yes☐　No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
　　　Yes☐　No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
　　　Yes☐　No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*
1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☒ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
　　(Please specify)

B. *Diversity Jurisdiction Cases:*
1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
　　(Please specify)

**ARBITRATION CERTIFICATION**
*(Check Appropriate Category)*

I, Joshua Prince, Esq. , counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: June 10, 2013　　　Joshua Prince　　　306521

　　　　　Attorney-at-Law　　　　　Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: June 10, 2013　　　Joshua Prince　　　306521

　　　　　Attorney-at-Law　　　　　Attorney I.D.#

CIV. 609 (6/08)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Christopher Thorpe | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| City of Philadelphia, et al. | : | |
| | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.       ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
     and Human Services denying plaintiff Social Security Benefits.       ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
     exposure to asbestos.       ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
     commonly referred to as complex and that need special or intense management by
     the court. (See reverse side of this form for a detailed explanation of special
     management cases.)       ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.   (X )

| | | |
|---|---|---|
| June 10, 2013 | Joshua Prince, Esq. | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 610-845-3803, ext 81114 | 610-845-3903 | Joshua@PrinceLaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____ :
                                          :
CHRISTOPHER DANTE THORPE                   :
7913 Newbold Lane                          :
Laverock, PA 19038                         :        Civil Action No. _____
                          Plaintiff        :
                                           :
            v.                             :        Complaint—Civil Rights
                                           :
CITY OF PHILADELPHIA                       :
City Hall                                  :
S. Penn Square                             :        JURY TRIAL DEMANDED
Philadelphia, PA                           :
                                           :
COMMISSIONER CHARLES H. RAMSEY :
One Franklin Square                        :
Room 314                                   :
Philadelphia, PA 19106                     :
_Individually and in his official capacity_ :
_as an employee of the City of Philadelphia_ :
                                           :
OFFICER HOSGOOD (Badge #5307),             :
2831 Levick Street                         :
Philadelphia, PA 19149                     :
_Individual capacity_                      :
                                           :
OFFICER KRAWCZYK (Badge #5444),            :
2831 Levick Street                         :
Philadelphia, PA 19149                     :
_Individual capacity_                      :
                                           :
and                                        :
                                           :
UNKNOWN NUMBER OF                          :
JOHN AND JANE DOES                         :
_Individual capacities_                    :
                          Defendants        :

## COMPLAINT

Plaintiff, Christopher Dante Thorpe, by and through his attorney Joshua Prince of Prince Law Offices, P.C., hereby files this civil rights action against the City of Philadelphia and against the above-named persons in their individual and/or official capacities for the violation of Mr. Thorpe's constitutional rights to be free from unreasonable searches and seizures, to not have his property taken by the government without just compensation, and to lawfully keep and carry arms without infringement.

## JURISDICTION, VENUE AND PARTIES

1.     This action is brought pursuant to 42 U.S.C. §§ 1983, 1988. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343(a).

2.     Venue is proper in this Court pursuant to 28 U.S.C §§ 1331, 1343, 1391(a) because the action arises under the Constitution and laws of the United States, it involves deprivation of a civil liberty, and all of the events giving rise to this action took place within the territory of the Eastern District of Pennsylvania.

3.     Plaintiff, Christopher Dante Thorpe ("Plaintiff" or "Mr. Thorpe"), is an adult individual currently residing in Laverock, Montgomery County, Pennsylvania, but at the time of the incidents, resided in Philadelphia, Pennsylvania.

4.     Defendant, City of Philadelphia (the "City") is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs, and controls the Philadelphia Police Department (the "PPD"), which employs each of the individual defendants named in the caption of this Complaint and is responsible for the hiring, training, supervision, disciplining and retention of police officers, including the

Defendants Hosgood, Krawczyk and John and Jane Does. Defendant City is a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law.

5.     The individual defendants named in the caption of this Complaint were, at all relevant times hereto, adult people or "persons" under 42 U.S.C. § 1983 and were police officers or other agents of the PPD. They are each being sued in their individual capacities.

6.     Defendant Charles H. Ramsey (Ramsey) was at all times relevant hereto, an adult person under 42 U.S.C. § 1983 was at all relevant times the Police Commissioner of the City of Philadelphia and at all times herein complained of was acting under color of state law, specifically, under color of the statutes, ordinances, regulations, policies, customs and usages of the Commonwealth of Pennsylvania and the City, as well as being responsible for the hiring, training and supervision of the individual officers, Defendants Hosgood, Krawczyk and John and Jane Does, and approved of Defendants Hosgood, Krawczyk and John and Jane Does conduct. Defendant Ramsey is a "person" under 42 U.S.C. § 1983. He is sued in his individual capacity and official capacity. He is being sued in his official capacity only for injunctive relief, pursuant to *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).

7.     The "John and Jane Doe" Defendants set forth is the caption of this Complaint were, at all times relevant hereto, adult persons under 42 U.S.C. § 1983, and were police officers or other agents of the PPD, and they are each being sued in their individual capacities. Mr. Thorpe names "John and Jane Doe" defendants in the caption of this Complaint because he is not currently aware of the identities of all persons involved in and liable for certain acts described herein.

8.     At all times relevant hereto, for purposes of all civil rights claims asserted herein, all Defendants, including any and all John and Jane Doe Defendants, were acting under color of state law.

9.     At all times relevant hereto, the actions taken by the Defendants, including John and Jane Doe Defendants, deprived Mr. Thorpe of his constitutional rights including, but not limited to, his rights under the Second, Fourth, and Fifth Amendments to the United States Constitution, applicable to the Defendants by way of the Due Process Clause of the Fourteenth Amendment.

## FACTS

10.     On June 30, 2011, Mr. Thorpe was at his former home at 5047 Duffield Street in Philadelphia, PA.

11.     At some point during the late afternoon, Mr. Thorpe learned that his stepson, Emmanuel, had a friend, Brandon Little, with him in the house.

12.     Emmanuel was grounded and was not allowed to have any friends in the house.

13.     Mr. Thorpe instructed Brandon to leave the house, which he eventually did, after protesting.

14.     Mr. Thorpe began to admonish Emmanuel for having a friend in the house when he was not allowed.

15.     Emmanuel physically attacked Mr. Thorpe and Mr. Thorpe was able to eventually restrain Emmanuel.

16.     Seeing Emmanuel restrained, Brandon came back into the house and began to beat Mr. Thorpe.

17.     Mr. Thorpe let go of Emmanuel and both youths began to beat Mr. Thorpe.

18.     Eventually, Mr. Thorpe got away from the youths and both youths ran out the back door of the house.

19.     Mr. Thorpe called 911 to report the incident.

20.     Soon afterward a police officer arrived and began to fill out a report of the incident.

21.     In the middle of the officer's conversation with Mr. Thorpe, the officer got an emergency call and had to leave, stating that he would return.

22.     Several hours later, Emmanuel's mother came home and, realizing Emmanuel was not home, went to go look for him at Brandon's house located at 5014 Duffield Street because Emmanuel was grounded and not allowed out with friends.

23.     Emmanuel's mother found Emmanuel at Brandon's house.

24.     When she tried to get Emmanuel to come home, Brandon physically attacked her.

25.     When Emmanuel's mother returned home and Mr. Thorpe learned of this attack, he gave up waiting for the police to return and decided to inform Brandon's mother, Ms. Little, of Brandon's recent attacks and to see if he could work the situation out with her.

26.     Mr. Thorpe walked to Ms. Little's house and encountered William Little, Brandon's older brother.

27.     Mr. Thorpe asked William if he could speak with William's mother and brother.

28.     In response, William began to curse at Mr. Thorpe and then threatened to have Mr. Thorpe killed.

29.     Mr. Thorpe walked back down the street towards his own house while William, Brandon, and Ms. Little (the latter two had come out of the house as Mr. Thorpe was leaving) shouted obscenities at him.

30.     Shortly after Mr. Thorpe arrived home, Defendants Hosgood and Krawczyk arrived at Mr. Thorpe's home.

31.     Mr. Thorpe believed the officers had come to finish the initial report that he had begun earlier with the officer who left due to an emergency.

32.     Defendants Hosgood and Krawczyk, however, explained that they received a call from the Little household in which William Little allegedly accused Mr. Thorpe of showing him a gun and threatening to shoot him.

33.     Defendants Hosgood and Krawczyk frisked Mr. Thorpe and seized three loaded 9mm magazines from Mr. Thorpe's pocket. One magazine contained 10 rounds of ammunition, one magazine contained 14 rounds of ammunition, and one magazine contained 16 rounds of ammunition. These magazines and the ammunition they contained were placed on property receipts 2976525 and 2976526. A copy of the property receipts are attached hereto and incorporated herein as Exhibit A.

34.     Defendants Hosgood and Krawczyk asked Mr. Thorpe if he owned any firearms and Mr. Thorpe answered in the affirmative.

35.     Mr. Thorpe lawfully owned at least three firearms and was not prohibited by law from owning or possessing firearms or ammunition.

36.     Additionally, Mr. Thorpe had a valid Pennsylvania License to Carry Firearms.

37.     Defendants Hosgood and Krawczyk instructed Mr. Thorpe to tell them where in the house Mr. Thorpe's firearms were, or Defendants Hosgood and Krawczyk would "lock down" Mr. Thorpe's house and "put [his] kids in the street."

38.     Mr. Thorpe complied and told Defendants Hosgood and Krawczyk the location of his firearms.

39.     Defendants Hosgood and Krawczyk then seized two Glock pistols and one Bushmaster XM-15 rifle from Mr. Thorpe's house, as well as 6 30-round magazines loaded with a total of 180 rounds of .223 ammunition, one empty 30-round .223 magazine, and 5 more 9mm magazines, each loaded with 14 rounds of ammunition. Each of these items was recorded on property receipts 2976525 and 2976526. *See*, Exhibit A.

40.     Defendants Hosgood and Krawczyk also seized Mr. Thorpe's valid License to Carry Firearms and Mr. Thorpe's valid Pennsylvania Driver's License.

41.     Defendants Hosgood and Krawczyk asked Mr. Thorpe if he had a firearm on his person when he went to visit the Little house.

42.     Mr. Thorpe answered in the negative and told Defendants Hosgood and Krawczyk that the firearm was in a drawer in the upstairs of his house at the time.

43.     Defendants Hosgood and Krawczyk then placed Mr. Thorpe under arrest and charged him with terroristic threats and possession of an instrument of crime.

44.     Defendants Hosgood and Krawczyk did not have probable cause to make such an arrest.

45.     Defendants Hosgood and Krawczyk did not have probable cause to seize Mr. Thorpe's firearms and ammunition.

46.     Defendants Hosgood and Krawczyk did not have probable cause to seize Mr. Thorpe's valid Pennsylvania License to Carry Firearms or Mr. Thorpe's valid Pennsylvania Driver's License.

47.     Mr. Thorpe was tried for terroristic threats and possession of an instrument of crime on March 2, 2012 in the Municipal Court of Philadelphia before the Honorable Frank Palumbo (Docket # MC-51-CR-0028183-2011).

48.     At Mr. Thorpe's trial, William Little, Mr. Thorpe's accuser, affirmed his previous statements[1] to detectives that he could *not* identify the object on Mr. Thorpe's hip at the time of the incident as a gun. A copy of Mr. Thorpe's trial transcript is attached hereto and incorporated herein as Exhibit C.

49.     At trial, Judge Frank Palumbo found Mr. Thorpe not guilty on all charges.

50.     Mr. Thorpe incurred attorney's fees in the amount of $1500.00 to successfully defend against the two charges.

51.     Mr. Thorpe now desires to have those charges expunged from his record.

52.     Mr. Thorpe will incur future attorney's fees and costs in his pursuit of the expungement of his record.

53.     At his own personal expense of $25.00, Mr. Thorpe subsequently took the time to petition the Court of Common Pleas *pro se* for the return of his firearms and ammunition, and attended a forfeiture hearing on October 25, 2012. A copy of Mr. Thorpe's filing receipt and hearing notice is attached hereto and incorporated herein as Exhibit D.

54.     Mr. Thorpe successfully obtained from the Court of Common Pleas two orders on October 25, 2012, which directed Defendants to return Mr. Thorpe's firearms and ammunition listed on property receipts 2976525 and 2976526. Copies of these orders are attached hereto and incorporated herein and are marked Exhibits E and F, respectively.

55.     Mr. Thorpe received his three firearms back from the PPD.

---

[1] On July 1, 2011, the day after Mr. Thorpe was arrested, Mr. Little told detective Guarna (badge #9032), that he only saw what he believed to be a gun under Mr. Thorpe's shirt. Mr. Little also confirmed that Mr. Thorpe did not pull a gun, show a gun to Mr. Little, or point the gun at Mr. Little at any time during their argument the previous evening. A copy of Mr. Little's Investigation Interview Record in attached hereto and incorporated herein as Exhibit B.

56.     When he received his Bushmaster XM-15 rifle from the PPD, Mr. Thorpe noticed a prominent scratch on the rifle that had never been there before. Two pictures of the scratch are attached hereto and incorporated herein as Exhibits G and H, respectively.

57.     When Mr. Thorpe attempted to recover his 290 rounds of seized ammunition, PPD Officer John Doe told him the rounds had been destroyed and that it is PPD policy to destroy all ammunition the PPD confiscates.

58.     The Defendant John and Jane Does' destruction of Mr. Thorpe's ammunition was in violation of the court's October 25, 2012 Order.


### COUNT I - 42 U.S.C. § 1983 - WRONGFUL SEIZURE OF PROPERTY UNDER THE FOURTH AMENDMENT
*(Defendants City, Hosgood and Krawczyk)*

59.     The foregoing paragraphs are incorporated herein as if set forth in full.

60.     Mr. Thorpe's personal property (his firearms, magazines, License to Carry Firearms, Driver's License, and ammunition) was unlawfully seized by Defendants Hosgood and Krawczyk, not because they had a valid, properly executed warrant or even probable cause or reasonable suspicion, but instead, because Defendants Hosgood and Krawczyk believed they could seize Mr. Thorpe's firearms, magazines, License to Carry Firearms, Driver's License, and ammunition without providing Mr. Thorpe Due Process, which is contrary to the law.

61.     Although Defendants Hosgood and Krawczyk spoke with complainant William Little, at no time did they interview disinterested witnesses, attempt to corroborate William Little's statements that Mr. Thorpe had a gun on his person, conduct any investigation whatsoever into whether or not Mr. Thorpe showed a gun in a threatening

manner to William Little or made a verbal threat to William Little, or withdraw the charges against Mr. Thorpe once the Defendants discovered that Mr. Little's statements to the police did not support the conclusion that a crime occurred.

62.     Defendants Hosgood and Krawczyk at no time sought or obtained information that Mr. Thorpe was prohibited by law from owning, possessing, and/or carrying firearms and/or ammunition.

63.     Instead, Defendants Hosgood and Krawczyk summarily took Mr. Thorpe's lawfully owned and possessed personal property from his home and person without due process, under the threat that Defendants Hosgood and Krawczyk would "lock down" Mr. Thorpe's house and "put [his] kids in the street."

64.     The taking of Mr. Thorpe's firearms, magazines, License to Carry Firearms, Driver's License, and ammunition by Defendants Hosgood and Krawczyk was an unconstitutional seizure of Mr. Thorpe's property in violation of the Fourth Amendment.

65.     During his entire encounter with Defendants Hosgood and Krawczyk, Mr. Thorpe was embarrassed and humiliated in the presence of his family and neighbors who witnessed this episode, and his personal property was unlawfully taken from him, both of which events directly and proximately caused harm to Mr. Thorpe.

66.     The actions of Defendants Hosgood and Krawczyk in seizing Mr. Thorpe's property were intentional, willful, malicious, and/or were in reckless disregard of Mr. Thorpe's constitutional rights.

67.     The PPD and, by extension, the City, caused these violations of Mr. Thorpe's civil rights through its confiscation of Mr. Thorpe's personal property with no reason to believe he was prohibited by law from owning firearms and ammunition, and through the

City's encouragement, toleration, and ratification of, and its deliberate indifference to the need to properly discipline, train, and supervise officers with regard to the standards for reasonable suspicion, probable cause, the ability to confirm whether or not a citizen is prohibited by law from owning or possessing firearms or ammunition, and the proper grounds and procedure for the seizure of the personal property of citizens, all in the face of numerous ongoing complaints and incidents in which PPD officers violated people's rights with respect to the lawful possession and ownership of firearms. Such discipline, training and supervision were obviously necessary to avoid constitutional violations, and the failure to carry out such discipline, training and supervision was a direct and proximate cause of Mr. Thorpe's damages with regard to the seizure of his property.

WHEREFORE, Plaintiff, Christopher Dante Thorpe, requests judgment in his favor and against Defendant City, Defendant Hosgood, and Defendant Krawczyk, and requests the following relief:

(a)     A declaration that the City as well as Defendants Hosgood and Krawczyk violated Mr. Thorpe's constitutional rights;

(b)     A permanent injunction prohibiting the PPD and, by extension, Defendant City, from seizing citizens' lawfully owned and carried firearms, unless the owner/possessor/carrier of the firearm is otherwise prohibited by law from owning or possessing firearms and/or ammunition, or unless the possessed/carried firearm is needed as evidence for a bona fide criminal investigation or prosecution;

(c)     An award of compensatory damages against Defendant City, Defendant Hosgood, and Defendant Krawczyk jointly and severally, in a sum to be determined at

trial;

(d)    An award of punitive damages against Defendants Hosgood and Krawczyk as a result of their illegal seizure of Mr. Thorpe's firearms, magazines, and ammunition; and

(e)    An award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.


## COUNT II - 42 U.S.C. § 1983 - WRONGFUL SEIZURE AND DETENTION OF MR. THORPE UNDER THE FOURTH AMENDMENT
### *(Defendants City, Hosgood and Krawczyk)*

68.    The foregoing paragraphs are incorporated herein as if set forth in full.

69.    Mr. Thorpe's himself was unlawfully seized when he was arrested by Defendants Hosgood and Krawczyk, who did not have valid, properly executed arrest warrant or probable cause to arrest Mr. Thorpe, which is contrary to the law.

70.    Defendants Hosgood's and Krawczyk's seizure of Mr. Thorpe deprived Mr. Thorpe of his liberty to be free from unlawful detention and unlawful arrest, as well as to be secure in his person and property, all without Due Process of law, in violation of the Fourth Amendment.

71.    Defendants Hosgood and Krawczyk made no attempt whatsoever to corroborate William Little's accusations of Mr. Thorpe, and obtained no additional evidence that could reasonably be used to establish probable cause to arrest Mr. Thorpe or that could reasonably be used against Mr. Thorpe in a court of law.

72.    Instead, Defendants Hosgood and Krawczyk summarily arrested Mr. Thorpe on William Little's word alone.

73.    The seizure of Mr. Thorpe's person by Defendants Hosgood and Krawczyk was an unconstitutional deprivation of Mr. Thorpe's liberty in to be free from unlawful

detention and unlawful arrest, as well as to be secure in his person and property, all without Due Process of law, in violation of the Fourth Amendment.

74.     During his entire encounter with Defendants Hosgood and Krawczyk, Mr. Thorpe was embarrassed and humiliated in the presence of his family and neighbors who witnessed Mr. Thorpe's arrest at his own home, which directly and proximately caused harm to Mr. Thorpe.

75.     The actions of Defendants Hosgood and Krawczyk in seizing Mr. Thorpe's person were intentional, willful, malicious, and/or were in reckless disregard of Mr. Thorpe's constitutional rights.

76.     The PPD and, by extension, the City, caused these violations of Mr. Thorpe's civil rights through Defendants Hosgood's and Krawczyk's arrest of Mr. Thorpe with no probable cause, and through the City's encouragement, toleration, and ratification of, and its deliberate indifference to the need to properly discipline, train, and supervise officers with regard to the standards for probable cause to arrest, the proper investigation of reports of crimes, and the proper grounds and procedure for the arrest of citizens, all in the face of numerous ongoing complaints and incidents in which PPD officers violated people's rights. Such discipline, training and supervision were obviously necessary to avoid constitutional violations, and the failure to carry out such discipline, training and supervision was a direct and proximate cause of Mr. Thorpe's damages with regard to his arrest and the deprivation of his liberty.

77.     As a result of Defendants Hosgood's and Krawczyk's actions in unlawfully arresting Mr. Thorpe, Mr. Thorpe has incurred $1500.00 in attorney's fees that he has paid to Prince Law Offices, P.C. to successfully defend himself against the improper

terroristic threats and possession of an instrument of crime charges, of which he was acquitted.

78.    As a result of Defendants Hosgood's and Krawczyk's actions in unlawfully arresting Mr. Thorpe, Mr. Thorpe will incur future attorney's fees and costs for the expungement of the two charges in this case of which he was found not guilty in a court of law.

WHEREFORE, Plaintiff, Christopher Dante Thorpe, requests judgment in his favor and against Defendant City, Defendant Hosgood, and Defendant Krawczyk, and requests the following relief:

(a)    A declaration that the City as well as Defendants Hosgood and Krawczyk violated Mr. Thorpe's constitutional rights;

(b)    An award of compensatory damages against Defendant City, Defendant Hosgood, and Defendant Krawczyk jointly and severally, in a sum to be determined at trial;

(c)    An award of punitive damages against Defendants Hosgood and Krawczyk as a result of their illegal arrest of Mr. Thorpe and the deprivation of his liberty; and

(d)    An award of reasonable attorneys' fees in the amount of $1500.00 for the legal expenses Mr. Thorpe incurred to successfully defend against the two charges in this case of which Mr. Thorpe was found not guilty in a court of law.

(e)    An award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, including future attorney's fees and costs for the expungement of the two charges in this case of which Mr. Thorpe was found not guilty in a court of law.

### COUNT III - 42 U.S.C. § 1983 – THE WRONGFUL DESTRUCTION AND DAMAGE OF PROPERTY UNDER THE FOURTH AND FIFTH AMENDMENTS
*(All Defendants)*

79.　　The foregoing paragraphs are incorporated herein as if set forth in full.

80.　　Mr. Thorpe's personal property, his ammunition, was unlawfully seized by Defendants Hosgood and Krawczyk because Mr. Thorpe was not prohibited by law from owning ammunition, had committed no crime, and because there was no probable cause to believe that Mr. Thorpe's ammunition had been used in a crime.

81.　　Not only was Mr. Thorpe's ammunition unlawfully seized by Defendants Hosgood and Krawczyk, but it was also unlawfully destroyed by the City and Defendant John and Jane Doe PPD officers in accordance with PPD's unlawful policy to destroy all ammunition that PPD seizes.

82.　　Defendant John and Jane Doe PPD officers destroyed Mr. Thorpe's ammunition in direct violation of the October 25, 2012 order from the Court of Common Pleas, which directed the PPD and Defendant Ramsey to return Mr. Thorpe's ammunition.

83.　　Defendant Ramsey's policy of destroying all ammunition the PPD seizes was in direct violation of the October 25, 2012 order from the Court of Common Pleas, which directed the PPD and Defendant Ramsey to return Mr. Thorpe's ammunition.

84.　　Defendant John and Jane Does' destruction of Mr. Thorpe's ammunition amounts to a government taking of Mr. Thorpe's private property, which should have been for public use and for which Mr. Thorpe should have been provided just compensation under the Fifth Amendment.

85.     No Defendant in this case offered or articulated to Mr. Thorpe any explanation for how taking his ammunition was for public use, nor did any Defendant in this case offer Mr. Thorpe just compensation for his ammunition, both of which the Fifth Amendment requires, making the conduct of all Defendants in taking Mr. Thorpe's ammunition or condoning that it be taken, violative of the Fifth Amendment.

86.     Defendant John and Jane Doe PPD officers also destroyed Mr. Thorpe's ammunition in direct violation of the October 25, 2012 Order from the Court of Common Pleas, which directed the PPD and Defendant Ramsey to return Mr. Thorpe's ammunition.

87.     Defendant Ramsey's policy of destroying all ammunition the PPD seizes was in direct violation of the October 25, 2012 Order from the Court of Common Pleas, which directed the PPD and Defendant Ramsey to return Mr. Thorpe's ammunition.

88.     Not only was Mr. Thorpe's Bushmaster XM-15 rifle seized unlawfully by Defendants Hosgood and Krawczyk, but it was damaged in the chain of custody by either Defendants Hosgood and/or Krawczyk and/or Defendans John and/or Jane Doe, when it was scratched.

89.     The damage to Mr. Thorpe's rifle during the unlawful seizure of the rifle violates the Fourth and Fifth Amendments.

90.     The actions of all Defendants in taking/destroying Mr. Thorpe's ammunition were intentional, willful, malicious, and/or were in reckless disregard of Mr. Thorpe's constitutional rights and were in direct violation of a court order.

91.     The actions of Defendants Hosgood and/or Krawczyk, and/or Defendants John and Jane Doe in damaging Mr. Thorpe's unlawfully seized rifle were intentional, willful, malicious, and/or were in reckless disregard of Mr. Thorpe's constitutional rights.

92.     Defendant Ramsey, through his policy to destroy all ammunition seized by the PPD, caused the above violations of Mr. Thorpe's civil rights by the Defendants John and Jane Does' destruction of Mr. Thorpe's ammunition with no offer of how such destruction would be considered public use of Mr. Thorpe's property, and with no offer of just compensation for Mr. Thorpe's ammunition.

93.     The actions of Defendant Ramsey in setting a policy for the PPD to destroy all ammunition seized by the PPD were intentional, willful, malicious, and/or were in reckless disregard of Mr. Thorpe's constitutional rights and were in direct violation of a court order.

94.     Defendant City also caused the violation of Mr. Thorpe's civil rights through the City's encouragement, toleration, and ratification of, and its deliberate indifference to the need to properly discipline, train, and supervise officers with regard to the standards for handling the personal property of citizens, particularly ammunition, and the proper grounds and procedure for maintaining the seized personal property of citizens, all in the face of numerous ongoing complaints and incidents in which PPD officers violated people's rights with respect to the unlawful destruction of citizens' ammunition. Such discipline, training and supervision were obviously necessary to avoid constitutional violations, and the failure to carry out such discipline, training and supervision was a direct and proximate cause of Mr. Thorpe's damages with regard to the taking of his ammunition.

95.     The PPD and, by extension, the City, caused the violation of Mr. Thorpe's civil

rights through Defendant Hosgood's, Defendant Krawczyk's, and/or Defendants John

and/or Jane Doe's damage to Mr. Thorpe's unlawfully seized rifle when they scratched it,

and through the City's encouragement, toleration, and ratification of, and its deliberate

indifference to the need to properly discipline, train, and supervise officers with regard to

standards for keeping the seized property of citizens damage-free in the chain of custody,

and the proper grounds and procedure for the seizure and storage of the seized personal

property of citizens, all in the face of numerous ongoing complaints and incidents in

which PPD officers violated people's rights. Such discipline, training and supervision

were obviously necessary to avoid constitutional violations, and the failure to carry out

such discipline, training and supervision was a direct and proximate cause of Mr.

Thorpe's damages with regard to the damage to his property.


WHEREFORE, Plaintiff, Christopher Dante Thorpe, requests judgment in his favor

and against all Defendants, and requests the following relief:

(a)     A declaration that all Defendants violated Mr. Thorpe's constitutional rights;

(b)     A permanent injunction prohibiting the PPD from destroying seized firearms

or ammunition without complying with the proper legal process of petitioning for

forfeiture;

(c)     An award of compensatory damages against Defendant City, Defendant

Hosgood, Defendant Krawczyk, and Defendants John and Jane Does jointly and

severally, in a sum to be determined at trial, that shall include reimbursement of the

$25.00 Mr. Thorpe spent to file his Petition for the Return of Property, as well as

reasonable compensatory damages for Mr. Thorpe's time in filing the petition, attending the forfeiture hearing, and obtaining his firearms;

(d)     An award of punitive damages against Defendant Ramsey and Defendants John and Jane Does as a result of their willful illegal taking of Mr. Thorpe's ammunition; and

(e)     An award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT IV - 42 U.S.C. § 1983 – INFRINGMENT OF THE RIGHT TO KEEP AND BEAR ARMS UNDER THE SECOND AMENDMENT
*(All Defendants)*

96.     The foregoing paragraphs are incorporated herein as if set forth in full.

97.     Mr. Thorpe has the right to keep and bear arms without infringement, which includes lawfully keeping firearms in his home.

98.     All Defendants violated Mr. Thorpe's right to keep and bear arms when they either unlawfully seized Mr. Thorpe's firearms and ammunition and/or destroyed Mr. Thorpe's ammunition and/or condoned, encouraged, tolerated, or ratified such actions.

99.     Defendants Hosgood and Krawczyk knew or should have known that Mr. Thorpe was not prohibited by law from owning or carrying firearms and ammunition and that Mr. Thorpe possessed his firearms lawfully.

100.     The actions of all Defendants in violating Mr. Thorpe's Second Amendment rights were done intentionally, maliciously, willfully, and/or with reckless disregard for Mr. Thorpe's rights.

101.     Defendant Ramsey, through his policy to destroy all ammunition seized by the PPD, caused the above violations of Mr. Thorpe's Second Amendment rights through the Defendants John and Jane Does' destruction of Mr. Thorpe's ammunition.

102.     Defendant City also caused the violation of Mr. Thorpe's civil rights through the City's encouragement, toleration, and ratification of, and its deliberate indifference to the need to properly discipline, train, and supervise officers with regard to the standards for handling the personal property of citizens, particularly ammunition, and the proper grounds and procedure for maintaining the seized personal property of citizens, all in the face of numerous ongoing complaints and incidents in which PPD officers violated people's Second Amendment rights. Such discipline, training and supervision were obviously necessary to avoid constitutional violations, and the failure to carry out such discipline, training and supervision was a direct and proximate cause of Mr. Thorpe's damages.

103.     The PPD and, by extension, the City, caused the violations of Mr. Thorpe's civil rights through its confiscation of Mr. Thorpe's personal firearms with no reason to believe he was prohibited by law from owning firearms and ammunition, and through the City's encouragement, toleration, and ratification of, and its deliberate indifference to the need to properly discipline, train, and supervise officers with regard to the standards for reasonable suspicion, probable cause, the ability to confirm whether or not a citizen is prohibited by law from owning or possessing firearms or ammunition, the right of the people to own firearms and to be free from government infringement of that right, and the proper grounds and procedure for the seizure of the personal property of citizens, all in the face of numerous ongoing complaints and incidents in which PPD officers violated

people's rights with respect to the lawful possession and ownership of firearms. Such discipline, training and supervision were obviously necessary to avoid constitutional violations, and the failure to carry out such discipline, training and supervision was a direct and proximate cause of Mr. Thorpe's damages with regard to the violation of his Second Amendment rights.

WHEREFORE, Plaintiff, Christopher Dante Thorpe, requests judgment in his favor and against all Defendants, and requests the following relief:

(a)     A declaration that all Defendants violated Mr. Thorpe's constitutional rights;

(c)     An award of compensatory damages against Defendant City, Defendant Hosgood, Defendant Krawczyk, and Defendants John and Jane Does jointly and severally, in a sum to be determined at trial;

(d)     An award of punitive damages against Defendant Ramsey and Defendants John and Jane Does as a result of their willful illegal taking of Mr. Thorpe's ammunition; and

(e)     An award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988.

## JURY DEMAND

Plaintiff, Christopher Dante Thorpe, hereby demands a jury trial on all claims.

Respectfully Submitted,

_____

Joshua Prince, Esq.
Attorney ID: 306521
Prince Law Offices, P.C.
646 Lenape Rd
Bechtelsville, PA 19505
610-845-3803
610-845-3903 (fax)
Joshua@PrinceLaw.com

Exhibit A

| PROPERTY RECEIPT | FROM WHOM TAKEN | | | | | No. 2976525 | |
|---|---|---|---|---|---|---|---|
| ☐ LOST AND FOUND | christopher Dante Thorpe 3-20-73 | | AGE 38 | SEX m | | | |
| | ADDRESS 7913 Newbold Lane Laverock PA 19038 | | DATE 06-30-11 | TIME 5pm | DISTRICT 15th | UNIT 5C | |
| ☐ FOR INVESTIGATION | OWNER (If Known) Same | | | LAB USER FEE REQUESTED ☐ YES ☒ NO | DC NO. | | |
| ☐ PERSONAL PROPERTY FOR SAFEKEEPING | ADDRESS Same As Above | | | | 11-15-066017 SEIZURE NO. | | |
| ☒ EVIDENCE | DEFENDANT'S NAME Same As Above | | | BULK OF PROPERTY STORED AT F.I.U. | | | |

ITEMS OF PROPERTY AND CIRCUMSTANCES UNDER WHICH IT WAS RECEIVED INCLUDING THE EXACT LOCATION TAKEN FROM

1. Description Of Evidence: (1) Glock 26 Ser:BUD775, (1) Glock
19 SER:CVE911, (1) Bushmaster XM-15 SER:BFI658617, (2) 9mm rounds
(1) 9mm magazine with (10) rounds,(5) 9mm magazines with(14) rounds
(1) 9mm magazine with(16) rounds,(6).223mm magazines with approx.
30 rounds each.

2. Circumstances Of Arrest: On 06-30-11 at approx 11:13PM at 5047
Duffeild Streetabove def. arrested for agg. assault. Guns recovered
from def. bedroom with def. permission.

3.Drug Field Test: N/A
4. Charfges: Agg. Assault   UCR 411
5. Additional Property Reciepts: N/A
6. Cp-Defendant: None
7. Case Number:   NEDD #9624   Assigned: Det. Guarna

| If the person from whom the above amount of money and/or property was taken does not sign below, state reason why: | RECEIVED BY POLICE DEPARTMENT |
|---|---|
| PERSON FROM WHOM TAKEN (Signature) | Arresting or Receiving Officer: (If personal property for safekeeping, DeskSupervisor is the Receiving Officer) |

| WITNESS (Signature) 271218 P/O Hosgood 271288 | BADGE NO. (Type) 5307 | SIGNATURE P/O Krawczyk 271286 | BADGE NO. (Type) 5444 |
|---|---|---|---|

## TRANSFERRED TO EVIDENCE CUSTODIAN/COLLECTOR

I hereby acknowledge receipt of the above listed items.

| (Date) | (Time) | (Evidence Custodian/Collection) |
|---|---|---|

## RELEASE FROM CUSTODY OF POLICE DEPARTMENT

This will acknowledge the receipt from the Police Department of the City of Philadelphia of the amount of money and/or property listed above, and will constitute the release of the City of Philadelphia and its agencies from any and all future responsibility therefor.

| ☐ Returned to Owner or Agent | RECEIVED BY (Owner or Agent) | | |
|---|---|---|---|
| ☐ Confiscated by Court | OWNER OR AGENT (Signature) | | |
| ☐ Destroyed by Order of Court | | | |
| Petition No. _____ | WITNESS (Signature) | BADGE NO. | DATE |
| ☐ Escheat to State | | | |
| Escheat List No. _____ | RECEIVED BY (Other than Owner or Agent) | | |
| ☐ To Department of Collections | SIGNATURE AND TITLE | | |
| ☐ Other Disposition (Explain): | | | |
| | WITNESS | | DATE |

5-3 (Rev. 6/95)

| PROPERTY RECEIPT | FROM WHOM TAKEN Christopher Dante Thorpe  03-20-73 | | AGE 38 | SEX m | № 2976526 | | |
|---|---|---|---|---|---|---|---|
| ☐ LOST AND FOUND | ADDRESS 5047 Duffield Street | | DATE 06-30-11 | TIME 11:15p | DISTRICT 15TH | UNIT 5C | |
| ☐ FOR INVESTIGATION | OWNER (If Known) Same As Above | | LAB USER FEE REQUESTED ☐ YES  ☒ NO | | DC NO. 11-15-66017 | | |
| ☐ PERSONAL PROPERTY FOR SAFEKEEPING | ADDRESS 7913 Newbold Lane Laverock Pa 19038 | | | | SEIZURE NO. | | |
| XX EVIDENCE | DEFENDANT'S NAME Same As Above | BULK OF PROPERTY STORED AT F.I.U. | | | | | |

ITEMS OF PROPERTY AND CIRCUMSTANCES UNDER WHICH IT WAS RECEIVED INCLUDING THE EXACT LOCATION TAKEN FROM

1. Description Of Evidence: (1) Bushmaster XM-15 Ser:BFI658617, (6) .223mm magazines with various amounts of ammo in each, (1) .223 magazine with no ammo.

2. Circumstances Of Arrest: On 06-30-11 at approx 11:15pm abv. def. arresteed for agg assault at abv. loc. Guns recovered from def. bedroom with def. permission.

3. Drug Field Test: N/A

4. Charges: Agg. Assault  UCR 411

5. Additonal Property receipts: (2) Handguns on pr#2976525

6. Co-defendant: None

7. Case Number: NEDD #9624     Assinged: Det. Guarna

---

| If the person from whom the above amount of money and/or property was taken does not sign below, state reason why: | RECEIVED  BY  POLICE  DEPARTMENT |
|---|---|
| | Arresting  or Receiving Officer:  (If personal property for safekeeping, DeskSupervisor is the Receiving Officer) |

| PERSON FROM WHOM TAKEN (Signature) | | | RECEIVED BY POLICE | |
|---|---|---|---|---|
| WITNESS (Signature) P/O Hosgood  271238 | BADGE NO. (Type) 5307 | SIGNATURE P/O Krawczyk  271286 | | BADGE NO. (Type) 5444 |

**TRANSFERRED  TO  EVIDENCE  CUSTODIAN/COLLECTOR**

I hereby acknowledge receipt of the above listed items.

| (Date) | (Time) | (Evidence Custodian/Collection) |
|---|---|---|

**RELEASE  FROM  CUSTODY  OF  POLICE  DEPARTMENT**

This will acknowledge the receipt from the Police Department of the City of Philadelphia of the amount of money and/or property listed above, and will constitute the release of the City of Philadelphia and its agencies from any and all future responsibility therefor.

| ☐ Returned to Owner or Agent | **RECEIVED BY** (Owner or Agent) | | |
|---|---|---|---|
| ☐ Confiscated by Court | OWNER OR AGENT (Signature) | | |
| ☐ Destroyed by Order of Court | | | |
|    Petition No. _____ | WITNESS (Signature) | BADGE NO. | DATE |
| ☐ Escheat to State | | | |
|    Escheat List No. _____ | **RECEIVED BY** (Other than Owner of Agent) | | |
| ☐ To Department of Collections | SIGNATURE AND TITLE | | |
| ☐ Other Disposition (Explain): | | | |
| | WITNESS | | DATE |

75-3 (Rev. 6/95)

**POLICE DEPARTMENT**

Exhibit B

| INVESTIGATION INTERVIEW RECORD | PHILADELPHIA POLICE DEPARTMENT Northeast Detective Division | CASE #: INTERVIEWER: DET. GUARNA #9032 |
|---|---|---|

| NAME WILLIAM LITTLE | AGE 17 | RACE B | SEX M | DOB 4-18-94 |
|---|---|---|---|---|

| ADDRESS | APARTMENT # | PHONE # |
|---|---|---|

| NAME OF EMPLOYMENT/SCHOOL UNEMPLOYED | | SSN# |
|---|---|---|

| ADDRESS OF EMPLOYMENT/SCHOOL | DEPARTMENT | PHONE # |
|---|---|---|

| DATES OF PLANNED VACATIONS |
|---|

| DATES OF PLANNED BUSINESS TRIPS |
|---|

| NAME OF CLOSE RELATIVE MARTEZ WRITE |
|---|

| ADDRESS | PHONE# |
|---|---|

| PLACE OF INTERVIEW 2831 Levick St (NEDD Hqs) | DATE 7-1-11 | TIME 1:05AM |
|---|---|---|

| BROUGHT IN BY | DATE | TIME |
|---|---|---|

| WE ARE QUESTIONING YOU CONCERNING ASSAULT THAT YOU ARE REPORTING |
|---|

| WARNINGS GIVEN BY N/A | DATE | TIME |
|---|---|---|

| ANSWERS | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|---|

Q: I am Det. Guarna #9032 can you tell in your own words what happened to you tonight that brings you to Northeast Detective Division?

A: I was on the porch of my house tonight about an hour or two ago, I was fixing my bike and this guy that I know ( Chris ) came walking up. He asked where my brother was at, I asked him what the fuck he was looking for my brother for. He said where the fuck is your fucking brother, I asked him what the fuck he was looking for my brother for he was strapped. I could see he had a gun on his hip tucked in. He snapped on me like I was in the wrong, I asked him why is you strapped looking for my brother. He snapped and he told me that he was in an altercation with my brother earlier in the day. He got really angry and he was calling us all crack head and my mom a crack whore. He called me a pussy boy. I told him that he was pussy because he had a gun. He was blabbing and talking all this dumb shit, yelling that he was going to pop ( shoot ) me. He was still calling us names and after my mom came out he walked off.

Q: Were you injured?
A: No.

Q: Did he pull the gun out at any time during the argument?
A: No.

Q: Did he show the gun when he said that he was going to POP you?
A: I could see that there was a gun under his shirt, I know what it looks like.

Q: Did he point the gun at you at any time?
A: No.

| RECORD [ ] YES   [ ] NO | CHECKED BY: William Little |
|---|---|
| REVIEWED BY: | |

75-483

PAGE #2 OF

| **INVESTIGATION INTERVIEW RECORD**<br>*CONTINUATION SHEET* | CITY OF PHILADELPHIA<br>**POLICE   DEPARTMENT** |

Q: How do you know Chris?
A: He is my friends father.

Q: Where does he live?
A: Down the street.

Q: Who called the police?
A: My mom.

Q: How many guns did he have on him?
A: Just the one.

Q: Can you describe the gun?
A: Black that is all that I can describe it as.

Q: How long have you know this male?
A: Since they moved in I think since 2006.

Q: Did he fire the gun as he was walking away?
A: No.

Q: What is your brother's name?
A: Brandon Little.

Q: Do you know what the fight between your brother and Chris was about?
A: No.

Q: Is there anything else that you would like to add?
A: No.

Q: Can you please read and sign your interview if it is true and correct / accurate?

x _William Little_____

| RECORD<br>   [ ] YES   [ ] NO | CHECKED BY: |
| REVIEWED BY: | |

75-483

Exhibit C

27757
GA

1                           JUN 27 2012                      1    Jost

2         IN MUNICIPAL COURT OF PHILADELPHIA COUNTY

3               CRIMINAL TRIAL DIVISION

4                      - - -

5    COMMONWEALTH          :    MC-51-CR-0028183-2011
                           :
6                          :
          v.               :
7                          :
                           :
8    CHRISTOPHER THORPE     :

9                      - - -

10             Courtroom B, 1801 Vine Street

11              Philadelphia, Pennsylvania

12                     - - -

13                  March 2, 2012

14                     - - -

15                     Trial

16                     - - -

17

18

19

20

21

22

23    B E F O R E:   HONORABLE FRANK PALUMBO, J.

24

25

```
 1                                                        2

 2     APPEARANCES:

 3                    CHRIS CURCI, ESQUIRE
                      Assistant District Attorney
 4                    For the Commonwealth

 5
                      ERIC E. WINTER, ESQUIRE
 6                    Counsel for the defendant

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                                          3

2                 W I T N E S S   I N D E X

3                       - - -

4               C O M M O N W E A L T H

5
   WITNESS                DR   CR   RD   RCR
6

7   William Little        11   19   --   --

8   Officer Hosgood       24   27   29   --

9

10

11                     - - -

12               D E F E N S E

13

14  WITNESS                DR   CR   RD   RCR

15
   Christopher Thorpe     36   44   --   --
16

17

18

19

20

21

22

23

24

25

**COMMONWEALTH vs. CHRISTOPHER THORPE**                4

1

2              COURT CRIER:   Case No. 8,

3      Christopher Thorpe.

4              MR. CURCI:   Do I need my witness

5      to step out?

6              MR. WINTER:   It doesn't matter.

7      Motion to dismiss under Rule 1013.  Charges

8      were filed in this matter on June 30th.  The

9      case was listed for trial in August.  The

10     Commonwealth witnesses failed to appear.  The

11     case was continue on the Commonwealth to

12     October.  Commonwealth witnesses failed to

13     appear in October.  The  case was again

14     continued.  We are now well past 180 days.

15     We're up somewhere around 240 days.  I'm

16     asking for a dismissal based on Rule 1013.

17             MR. CURCI:   Your Honor.

18             THE COURT:   Wait.  If you're not

19     conceding the motion, I have to take the time

20     in sequence and give you a ruling on each time

21             MR. CURCI:   Sure.

22             THE COURT:   Okay.  Commonwealth,

23     let's take each sequence in time.  Counsel,

24     you tell me the issue why you say it should be

25     Commonwealth time and I'll give you a ruling

**COMMONWEALTH vs. CHRISTOPHER THORPE**                5

1
2    on each, and then you'll do the math at the
3    end.
4                    MR. CURCI:  Okay.
5                    MR. WINTER:  My client was -- to
6    my understanding of the dates, he was arrested
7    and arraigned on June the 30th, okay, of 2011.
8    The case was listed for trial on August the
9    8th of 2011.  We appeared that day.  We were
10   ready to go.  All that time was running
11   against the Commonwealth.  I told the
12   Commonwealth we were ready to go.  They
13   indicated their witnesses did not appear.
14                    THE COURT:  Commonwealth.
15                    MR. CURCI:  I'm not disputing
16   that.
17                    THE COURT:  June 30 to August 8,
18   Commonwealth time, right?
19                    MR. CURCI:  Sure.
20                    THE COURT:  Okay.  Next date.
21                    MR. WINTER:  The case was next
22   listed for trial on October the 25th.  We
23   appeared that day.
24                    THE COURT:  Commonwealth, do you
25   concede that time?

1   **COMMONWEALTH vs. CHRISTOPHER THORPE**          6

2                    MR. CURCI:  Yes.

3                    THE COURT:  Okay.  Commonwealth

4       time.

5                    MR. WINTER:  Commonwealth

6       witnesses failed to appear.

7                    THE COURT:  He's conceding.

8       Okay.

9                    MR. WINTER:  He's conceding.

10                   THE COURT:  Next date.

11                   MR. WINTER:  Next date the case

12      was listed for January.  I forget what the

13      date was in January.

14                   MR. CURCI:  The 23rd.

15                   THE COURT:  Commonwealth, do you

16      concede that or not?

17                   MR. CURCI:  The time between

18      10/25 and 1/23, I do.  But the only thing I

19      would add to that, Your Honor --

20                   THE COURT:  Well, if you concede

21      it --

22                   MR. CURCI:  Well, no, I won't

23      concede it because the complaining witness who

24      is a school student was taking the SAT's that

25      day and had to take his sister to school, so

COMMONWEALTH vs. CHRISTOPHER THORPE                    7

1

2      he couldn't be here.

3                    MR. WINTER:  Well, there was no

4      notice of that.

5                    THE COURT:  Well, why is it not

6      Commonwealth time?

7                    MR. CURCI:  It's Commonwealth

8      time, yeah.

9                    THE COURT:  Okay.  That's fine.

10     Okay.

11                   MR. WINTER:  What you have is

12     July which is --

13                   THE COURT:  Wait.  Any other

14     segments.

15                   MR. WINTER:  We can take from

16     that day to today.  We can take from January

17     23rd to today which, again, it was continued

18     on the Commonwealth because the Commonwealth

19     witness is unavailable.

20                   MR. CURCI:  That's inaccurate,

21     Your Honor.  That was an advance defense

22     request.  Mr. Winter was actually in Reading,

23     Pennsylvania that day and gave his advance

24     notice that he wouldn't be here.  I actually

25     called the witness myself and told them not to

1    COMMONWEALTH vs. CHRISTOPHER THORPE              8
2    come to court in January, so that was defense
3    time.
4                    THE COURT:  I want to give you
5    a ruling on each segment and then you both can
6    do the arithmetic.  So, every segment up till
7    this point is Commonwealth time.
8                    MR. CURCI:  Right up until
9    January 23rd.  That's correct
10                   THE COURT:  The last segment is
11   not.
12                   MR. CURCI:  That's also correct.
13                   THE COURT:  That's my ruling.
14   Now, that results in a certain number of days.
15   What is the math?
16                   MR. WINTER:  Your Honor, you got
17   31 days in July, 31 days in August which is 62
18   days, 30 days in September which brings you up
19   to 92 days, 31 days in October which brings
20   you up to 123 days, 30 days in November which
21   brings you up to a 153 days, I belive, and 31
22   days in December which brings you up to 183
23   days.  So, as of December 31st, 2011 they're
24   over their 180 and we still have the month of
25   January to add in.

**COMMONWEALTH vs. CHRISTOPHER THORPE**                    9

1

2              THE COURT:  Okay.  183 plus 25.

3              MR. WINTER:  Correct.

4              MR. CURCI:  Plus 23.  It was

5    actually 182.  You added one day in the middle

6    of that.  I didn't want to cut you off.

7              THE COURT:  Okay.  Wait.  You're

8    making me do this math.  I thought you would

9    have done the math.  It's 182 plus what?

10             MR. CURCI:  Twenty-three.

11             THE COURT:  So, it's 205.

12             MR. CURCI:  Correct.

13             THE COURT:  What flows from that

14   205?  What's your position, Commonwealth?

15             MR. CURCI:  Well, as you know

16   there's a 30 day window for other

17   circumstances, and here we have a situation

18   where the complaining witness is a school

19   student and wasn't available to come in

20   October.  He had to take his sister to school

21   and he had his SAT's, and that's why we're

22   here.  We're within the 30 day grace window

23   that's allowed.

24             THE COURT:  How about the 30 day

25   window?

1           **COMMONWEALTH vs. CHRISTOPHER THORPE**          10

2                         MR. WINTER:  We're past the 30

3      day window.

4                         THE COURT:  No, we're not.

5      We're at 205.

6                         MR. WINTER:  Well, we're barely

7      within the 30 day window.  Their witness

8      failed to appear twice.

9                         THE COURT:  Okay.  Motion

10     denied.

11                        MR. WINTER:  All right.

12                        MR. CURCI:  Call our first

13     witness?

14                        THE COURT:  Yes.

15                        MR. CURCI:  Commonwealth, calls

16     William Little.

17                            - - -

18                        ... WILLIAM LITTLE, having been

19     duly sworn, was examined and testified as

20     follows:

21                            - - -

22                        COURT CRIER:  In a loud clear

23     voice, state your name and spell it.

24                        THE WITNESS:  William Little,

25     W-I-L-L-I-A-M, L-I-T-T-L-E.

1       **COMMONWEALTH vs. CHRISTOPHER THORPE**        11

2                          - - -

3                  COMMONWEALTH'S EVIDENCE

4                  DIRECT EXAMINATION

5                          - - -

6    BY MR. CURCI:

7    Q.      William, I want to take you back to June 30th,

8    2011 at approximately eleven o'clock in the evening.

9    Do you remember that night?

10   A.      Uh-huh.

11   Q.      And just make sure you answer nice and loud so

12   everybody can hear you.

13           Were you at 5014 Duffield Street in

14   Philadelphia?

15   A.      Yeah.

16   Q.      Is that your address?

17   A.      Yeah.

18   Q.      And who do you live there with?

19   A.      My mom, my brother, and my little sister.

20   Q.      How old are you?

21   A.      I'm 17 now.

22   Q.      Okay.  How old is your brother?

23   A.      Fifteen.

24   Q.      Okay.  What's his name?

25   A.      Brandon.

1           **COMMONWEALTH vs. CHRISTOPHER THORPE**        12

2    Q.    Where were you that night?

3    A.    On the porch.

4    Q.    And is this a row home you live in?

5    A.    Yeah.

6    Q.    Okay.  So, it's a front porch attached to the

7    front of the house?

8    A.    Yeah.

9    Q.    Did you come into contact with anybody that

10   you see here in the courtroom?

11   A.    This guy right here.

12                   MR. CURCI:  Indicating for the

13           record by point of finger the defendant

14           Christopher Thorpe.

15   BY MR. CURCI:

16   Q.    How do you know Chris?

17   A.    He was one of my friend's stepdad.

18   Q.    One of your friend's stepdad?

19   A.    Yeah.

20   Q.    Okay.  And where does he live?

21   A.    Down the street.

22   Q.    And what happened that night?

23   A.    He came looking for my little brother.

24   Q.    Brandon?

25   A.    Yeah.

COMMONWEALTH vs. CHRISTOPHER THORPE          13

2  Q.      When you say he came looking for Brandon, what

3  do you mean?  Where did he come?  How did you come

4  into contact with him?

5  A.      He walked over to my porch and he was asking

6  for my little brother.

7  Q.      What did he say exactly?

8  A.      Where's my brother.

9  Q.      Okay.  And what did you say?

10  A.      Why you looking for my brother.

11  Q.      And then what did he say?

12  A.      Where's your brother.

13  Q.      All right.  Then what happened?

14  A.      We started getting into an argument.  He

15  called me names which I don't remember at this time

16  because it's been so long.

17  Q.      Okay.

18  A.      And I called him names, stuff like that.

19  Q.      All right.  And could you see anything?  Did

20  you notice anything about him about, you know, what

21  he was wearing or anything that he had with him?

22  A.      Well, he was lifting up his shirt like he had

23  a gun and all that.

24  Q.      And when you say he was lifting up his shirt,

25  how was he doing that?

1          **COMMONWEALTH vs. CHRISTOPHER THORPE**          14

2    A.      Like this when he was walking across the

3    street.

4                        MR. CURCI:  Indicating for the

5              record the witness lifted up his jacket like

6              that.

7                        THE WITNESS:  Yeah.

8    BY MR. CURCI:

9    Q.      Now, you say like he had a gun?

10   A.      Yeah.

11   Q.      Were you able to see a gun?

12   A.      I saw something black.  I can't identify it as

13   a gun.

14   Q.      Did he say anything?

15   A.      He said that he was going to pop a cap in me.

16   Q.      Pop a cap in you?

17   A.      Yeah.

18   Q.      What does that mean?

19   A.      Well, I belive it's an old western term that

20   he was going to shoot you.

21   Q.      Okay.  Now, do you know or why do you think he

22   came up looking for your brother?

23                        MR. WINTER:  Objection,

24              speculation.

25                        MR. CURCI:  I'm asking him why

1      **COMMONWEALTH vs. CHRISTOPHER THORPE**        15

2              and it goes to motive, why he thought he came

3              up to talk to him.  I'm asking about his state

4              of mind not his statement of mind.

5                          THE COURT:  Overruled.

6                          THE WITNESS:  Well, from what I

7              know, he got into an altercation with my

8              little brother earlier that day.

9      BY MR. CURCI:

10     Q.      Now, did you want him to talk to Brandon?

11     A.      Not at all.

12     Q.      Why not?

13     A.      Because he seemed angry and not in a clear

14     state of mind.

15     Q.      When you say he seemed angry, what do you

16     mean?

17     A.      Red, angry like violent.

18     Q.      Now, you said not in a clear state of mind,

19     what do you mean by that?

20     A.      Like he didn't really know what he was doing.

21     Q.      All right.  Now, when he said, I'm going to

22     pop a cap in your ass, what was he doing with his

23     hands at that time?

24                          MR. WINTER:  Objection.  I don't

25              believe that's what was testified to.

1                  COMMONWEALTH vs. CHRISTOPHER THORPE              16

2     BY MR. CURCI:

3     Q.     Or pop a cap.  I'm sorry.  Is that what he

4     said?

5     A.     Yeah.

6     Q.     What was he doing with his hands at that time?

7     A.     I don't remember at that point.

8                        MR. CURCI:  All right.  Court's

9            indulgence if I may.

10                         - - -

11                    (Brief pause.)

12                         - - -

13    BY MR. CURCI:

14    Q.     Now, while this was going on, at some point

15    was anybody else outside when this was happening?

16    A.     One of my friends but I mean he didn't --

17    Q.     Okay.  Who was home at the house?

18    A.     My mom, my brother, and my little sister.

19    Q.     Did your mom ever come outside?

20    A.     Yes.

21    Q.     Did he say anything to her?

22    A.     He called her a crack head.

23    Q.     Did your brother Brandon ever come outside?

24    A.     No, he stayed in the house.

25    Q.     William, do you remember -- well, let me ask

1          **COMMONWEALTH vs. CHRISTOPHER THORPE**          17

2     you this.  Were the police called that day?

3     A.      Yeah.

4     Q.      Do you know who called them?

5     A.      My mom.

6     Q.      Okay.  And then did you talk to the police

7     about this incident?

8     A.      Yeah.

9     Q.      Okay.  Do you remember going to the detectives

10    and talking about it?

11    A.      Uh-huh.

12    Q.      And do you remember speaking with Detective

13    Marone about it?

14    A.      I think that's what his name was.

15    Q.      Did you give a signed statement about that?

16    A.      Yeah.

17    Q.      Did you go over that with me today?

18    A.      Yeah.

19    Q.      Okay.  I'm going to show you what's marked as

20    C-1.  Do you recognize this?

21    A.      Yeah.

22    Q.      Is this the statement that you gave to the

23    detective?

24    A.      Yeah.

25    Q.      Is this the one that you and I went over

1          COMMONWEALTH vs. CHRISTOPHER THORPE          18

2     earlier today?

3     A.      Yeah.

4     Q.      Do you remember -- I'm going to show you what

5     it says which will be the fourth question on the

6     bottom of the first page.

7     A.      Yeah.

8     Q.      "Did he show the gun when he said he was going

9     to pop you?"

10          ANSWER:  "I could see that there was a gun under

11    his shirt.  I know what it looks like."

12          Do you remember giving that answer?

13    A.      Yeah.

14    Q.      And then the next question, "Did he point the

15    gun at you at any time?"  Your answer was no.

16          Do you remember giving that answer?

17    A.      Yeah.

18    Q.      And then on the second page a little bit

19    further down, "How many guns did he have on him?"

20    And the answer was, just the one.

21          Do you recall giving that answer?

22    A.      Yeah.

23    Q.      And the next question, "Can you describe the

24    gun?"  Your answer was, black, that is all I can

25    describe it as.

COMMONWEALTH vs. CHRISTOPHER THORPE                19

1

2    A.       Yeah.

3    Q.       Okay.  Now, how come you told the detectives

4    that you saw a black gun on him but here today you're

5    saying you couldn't see the gun?

6    A.       Because now that I think about it it was just

7    like a black object.  It could be anything that was

8    on his side.  I wouldn't waive anything on my side.

9    Q.       I'm not sure I understand the second part of

10   what you're saying.

11   A.       Yeah, yeah.  My bad.  I wouldn't lift up my

12   shirt for a cell phone, pretty much.

13                    MR. CURCI:  Your Honor, I have

14        no further questions for the witness.

15                    THE COURT:  Is this your only

16        witness?

17                    MR. CURCI:  I have one other

18        witness, a police officer.

19                    THE COURT:  Go ahead.

20                     - - -

21                 CROSS-EXAMINATION

22                     - - -

23   BY MR. WINTER:

24   Q.       All right.  So, sir, your testimony today is

25   that you are not certain it was a gun?

1              COMMONWEALTH vs. CHRISTOPHER THORPE        20

2    A.     Uh-huh.

3    Q.     Okay.  All right.

4                   THE COURT:  Well, I don't want

5           to cut off your cross but I don't know what

6           was made out here.  There's no VUFA charge.

7                   MR. CURCI:  Right.  This is a

8           trial.  It's a PIC and terroristic threat.

9                   THE COURT:  Okay.  And the PIC

10          goes to what crime?

11                  MR. CURCI:  Possession of the

12          gun.

13                  THE COURT:  No, I know.  But

14          there's not a VUFA charge.

15                  MR. CURCI:  Right.  The crime is

16          the terroristic threat.

17                  THE COURT:  I don't know how you

18          have a PIC without some other crime.

19                  MR. CURCI:  The terroristic

20          threat.

21                  MR. WINTER:  Right.

22                  THE COURT:  Okay.  Well, you can

23          cross if you want.

24                  MR. WINTER:  Okay.

25                  THE COURT:  I don't want to tell

1      **COMMONWEALTH vs. CHRISTOPHER THORPE**          21

2      you how to do your case.

3                      MR. WINTER:  I have nothing

4      then.

5                      MR. CURCI:  No further questions

6      for this witness, Your Honor.

7                          - - -

8                  (Witness excused.)

9                          - - -

10                     MR. CURCI:  Commonwealth calls

11     Officer Krawczyk.

12                     THE COURT:  What's the offer of

13     proof?

14                     MR. CURCI:  He's going to

15     testify, Your Honor, that they recovered

16     several guns inside the defendant's house and

17     it corroborates.

18                     MR. WINTER:  We'll stipulate.

19                     THE COURT:  Wait.  I'm just

20     asking for an offer of proof just to see.  It

21     might be stipulated to.

22                     MR. WINTER:  I'll stipulate to

23     all of that.  My client lawful possessed a

24     number of firearms.

25                     MR. CURCI:  Let me get it

1       **COMMONWEALTH vs. CHRISTOPHER THORPE**       22

2       exactly, Your Honor, so at least we can put it

3       on the record what they were.

4                   THE COURT:  Okay.

5                   MR. CURCI:  Okay.  Your Honor,

6       there's been a stipulation by and between

7       counsel that if Officer Hosgood and Krawczyk

8       were called to testify, they would testify

9       that on June 30th at approximately 11:10 p.m.

10      they responded to a radio call for a person

11      with a gun at 5014 Duffield Street.

12                  Upon arrival, they were met by

13      complainant William Little who informed the

14      officers that a male he knows as Chris came up

15      to him, pulled up his shirt, and flashed a gun

16      at him.  Told him he was going to pop a few

17      holes in him.

18                  MR. WINTER:  Obviously, I'm not

19      stipulating to that.  That's all hearsay.

20                  THE COURT:  I thought you just

21      wanted a stipulation as to guns being

22      recovered.

23                  MR. CURCI:  Well, I would call

24      him and ask him about that too.  It's an

25      inconsistent statement from the witness

1        **COMMONWEALTH vs. CHRISTOPHER THORPE**        23

2                        THE COURT:  It's going to be

3        objected to as to hearsay.  I belive it is.

4        So that part would not come in.

5                        MR. CURCI:  Well, it could come

6        in as a prior -- not for the truth of the

7        matter.

8                        THE COURT:  It's not coming in

9        for the truth, so leave it out.  I don't know

10       what relevance it has.

11                       MR. CURCI:  It goes to the

12       relevance as an inconsistent statement from

13       the witness, Your Honor.  That's fine.  It's

14       relevant because it's an inconsistent

15       statement.

16                       THE COURT:  I'm not going to

17       tell you how to do your case.  Obviously, it's

18       not saving time.  If you want to call this

19       officer -- you're apparently not going to

20       agree on a stipulation.

21                       MR. CURCI:  Well, no one told me

22       ahead of time there's going to be a 1013

23       motion or a stipulation to anything, so I'm

24       ready to try a case and I got witnesses.

25                       THE COURT:  Okay.

1      **COMMONWEALTH vs. CHRISTOPHER THORPE**          24

2                      MR. CURCI:  I'd call Officer C

3      like I wanted to do five minutes ago.

4                      - - -

5                      (Brief pause.)

6                      - - -

7                      MR. CURCI:  It's Officer

8      Hosgood.  Commonwealth calls Officer Hosgood.

9                      - - -

10                     ... OFFICER HOSGOOD, having been

11     duly sworn, was examined and testified as

12     follows:

13                     - - -

14                     COURT CRIER:  Officer, could you

15     identify yourself.

16                     THE WITNESS:  Officer Hosgood,

17     H-O-S-G-O-O-D, Badge No. 5307 currently

18     assigned to 15th District.

19                     - - -

20                     DIRECT EXAMINATION

21                     - - -

22     BY MR. CURCI:

23     Q.     Officer Hosgood, were you on duty June 30th,

24     2011 approximately 11:10 p.m.

25     A.     Yes, I was.

1              COMMONWEALTH vs. CHRISTOPHER THORPE          25

2     Q.      Did your tour of duty take you to 5014

3     Duffield Street in the city and county of

4     Philadelphia?

5     A.      Yes, it did.

6     Q.      And, Officer, what is it that brought you to

7     that location?

8     A.      I received a radio call for a person with a

9     gun.

10    Q.      And when you arrived at the scene, who did you

11    come in contact with?

12    A.      We spoke to a Mr. William Little.  He

13    indicated he had a --

14                    MR. WINTER:  Objection, hearsay.

15                    MR. CURCI:  I would ask for it

16            to come in not for the truth of the matter

17            asserted but as a prior inconsistent statement

18            of the witness William Little who just

19            testified.  So, it's not coming in to prove

20            the truth of what he said but it comes in to

21            show that he -- his statement has been a

22            little bit inconsistent from what he said

23            initially.

24                    THE COURT:  Overruled.

25    BY MR. CURCI:

1

2   Q.      What did Mr. Little say to you?

3   A.      He said he was in a verbal argument with the

4   defendant standing next to counsel about a problem

5   with his brother.  He said at that point in time the

6   defendant asked where his brother was located.  And

7   he said, why do you want to know?  He said the

8   defendant picked up his shirt revealing a black

9   semiautomatic handgun saying I have something for

10  him.  I'm going to pop him.

11  Q.      And after receiving that information, did you

12  go to the defendant Mr. Thorpe's house?

13  A.      Yes, I did.

14  Q.      Is that 5047 Duffield Street?

15  A.      Yes.

16  Q.      And what happened when you arrived there?

17  A.      We knocked on the door.  I heard a lot of

18  rustling behind the door.  Who is it?  I identified

19  myself as police.  The door was answered by Mr.

20  Thorpe's wife.  We asked if Chris was home.  She said

21  yes, he was.  Please come in the house.

22          At that point in time Mr. Thorpe came down the

23  steps.  As he was coming down the steps, I saw on his

24  right hip what appeared to be the bottom of a holster

25  to a weapon.  Mr. Thorpe was then frisked for my

COMMONWEALTH vs. CHRISTOPHER THORPE          27

1

2    safety as well as other police officers on the scene.

3    There was no gun in the holster but there was three

4    fully loaded .9 millimeter magazines in his back

5    pocket.  I asked Mr. Thorpe what happened.  He said

6    he did get in an argument with Mr. Little and he did

7    have his gun on him at the time.

8    Q.     And was anything recovered from the property?

9    A.     Yes.  We asked Mr. Thorpe if there were any

10   guns in the house.  He said there was.  He said there

11   were two guns upstairs in the bedroom.  He did give

12   us permission to recover the guns.  We went upstairs,

13   recovered two Glock handguns also a Bush Master XM15

14   assault riffle, placed all three guns on property

15   receipt 2976525.

16   Q.     And was he placed under arrest at that time?

17   A.     Yes, he was.

18              MR. CURCI:  Thank you.  I have

19       no further questions for the officer.

20                   - - -

21              CROSS-EXAMINATION

22                   - - -

23   BY MR. WINTER:

24   Q.     Officer, you said you prepared a report in

25   this matter?

1          **COMMONWEALTH vs. CHRISTOPHER THORPE**        28

2     A.      Yes, I did.

3     Q.      Do you have that report with you today?

4     A.      Not on me.

5     Q.      Okay.  You reviewed the report?

6     A.      Yes, I did.

7     Q.      Can you tell me where -- Commonwealth has the

8     report, correct?

9                         MR. CURCI:  Yes, you want to see

10         the statement he gave?

11                        MR. WINTER:  If I could.

12                        MR. CURCI:  Sure.

13                        - - -

14                        (Brief pause.)

15                        - - -

16    BY MR. WINTER:

17    Q.      Officer, there were not any charges pressed by

18    you or by anyone else to your knowledge in relation

19    to possession of firearms?  There was not a VUFA.

20    There was not a firearm to be carried without a

21    license, anything along those lines, correct?

22    A.      No.

23                        MR. WINTER:  All right.  That's

24         all I have for the officer.

25                        MR. CURCI:  I have one follow

1          **COMMONWEALTH vs. CHRISTOPHER THORPE**          29

2          question to that then.

3                              - - -

4                     REDIRECT EXAMINATION

5                              - - -

6     BY MR. CURCI:

7     Q.     Officer, did you investigate whether or not he

8     had a license to carry?

9     A.     Yes.  He did produce a license to carry out of

10    Montgomery County.

11    Q.     Is that why he wasn't charged with any VUFA

12    violation?

13    A.     Yes.

14                     MR. CURCI:  I have nothing

15          further.

16                     THE WITNESS:  May I be excused,

17          Your Honor?

18                     THE COURT:  Yes.

19                     MR. CURCI:  At this time, I

20          would mark and move --

21                     THE COURT:  Officer, before you

22          leave just one question.  Commonwealth if you

23          object to the question let me know.

24                     Was any action taken with regard

25          to revocation of his permit to carry

```
 1                 concealed, if you know?

 2                         THE WITNESS:  Was his permit to

 3                 carry revoked, sir, is that what you're

 4                 asking?

 5                         THE COURT:  Yes.

 6                         THE WITNESS:  That I do not

 7                 know.  That would have to come, I believe,

 8                 from Montgomery County.

 9                         THE COURT:  Okay.  And that's

10                 what I mean.  Did anyone from the police

11                 department in Philadelphia notify Montgomery

12                 County?

13                         THE WITNESS:  I do not know,

14                 Your Honor.

15                         THE COURT:  Thank you.

16                         THE WITNESS:  Thank you, sir.

17                         - - -

18                 (Witness excused.)

19                         - - -

20                         MR. CURCI:  Your Honor, I would

21                 mark as C-2 the certificate of licensure.  It

22                 is certified by the Pennsylvania State Police

23                 Custodian of Records, and it certified that

24                 Mr. Christopher Thorpe, date of birth,
```

COMMONWEALTH vs. CHRISTOPHER THORPE          31

1
2     3/20/1973, did not have a valid -- he did not
3     have a valid sportsman's firearm permit issued
4     under provisions of 6106; however, he did have
5     a valid license to carry a firearm issued
6     under provisions of Section 6109, which would
7     mean, Your Honor, that he was eligible to
8     possess those guns that were in his house.
9     And he also has a valid license to carry, and
10    we have a photocopy of that.  Counsel and I
11    would stipulate that that will be marked as
12    C-3.
13                    THE COURT:  Okay.
14                    MR. CURCI:  With C-1 marked and
15    moved into the evidence being the statement --
16                    THE COURT:  Well, before you
17    rest, may I ask, and either side can object to
18    the question, was any action taken to revoke
19    his permit to carry concealed?
20                    MR. WINTER:  Yes.  It was
21    reported to Montgomery County Sheriff's
22    Department, and my understanding is the matter
23    is under review; is that correct?
24                    THE DEFENDANT:  It's under
25    review.  The lieutenant had spoke to the

COMMONWEALTH vs. CHRISTOPHER THORPE          32

Sheriff Department and told them to please

mark the permit as being lost.  So, when this

is resolved, I can -- without going through

the whole motions of renewing the permit, I

can just go and pick it up.

    THE COURT:  Well, then you don't

oppose that coming in?

    MR. CURCI:  No.

    THE COURT:  Okay.

    MR. CURCI:  So, Your Honor, I

would move into evidence C-1, William Little's

statement to Detective Warren that he adopted,

C-2 which is the certificate that he does have

a valid license, as well as C-3 which is a

photo copy of his license, and mark and move

as C-4 the Quarter Session file indicating

Mr. Thorpe's date of birth as 3/20/1973 for

purposes of jurisdiction.  With that, the

Commonwealth rests for trial.

    THE COURT:  Okay.  On the

Commonwealth's evidence I just want to ask

defense counsel then, there was an objection

about the complainant's statement coming in as

hearsay.

1      **COMMONWEALTH vs. CHRISTOPHER THORPE**          33

2                          MR. CURCI:   Correct.

3                          THE COURT:   I did rule on that,

4      but there was no objection as to the

5      defendant's admission or statement coming in;

6      is that correct?

7                          MR. WINTER:   Well, it's

8      appropriate.   It's a statement by a party, so

9      yes.

10                         THE COURT:   I just want to make

11     that clear.   So, then as to the objection --

12                         MR. WINTER:   I would love to

13     object but I don't see a valid basis to

14     object.

15                         THE COURT:   Okay.   So, that's in

16     without objection.

17                         MR. WINTER:   Well, corpus

18     delicti is all I can argue there and obvious

19     the Court can't reach treating a statement as

20     the truth until it is determined that a crime

21     has actually occurred.   So, at this point, I

22     do have a motion in that regard, if the Court

23     would hear it.   So, I'm making a motion to

24     dismiss at this point.

25                         Again, what you have here is you

COMMONWEALTH vs. CHRISTOPHER THORPE          34

have inconsistent testimony from William
Little.   I  belive what you have to do for
today's purposes is to go with what he
actually testified to today.  And what he
testified to today is he could not say with
any certainty that my client had a gun on him
when this occurred.

Additionally, as the Court duly
pointed out for there to be possession of an
instrument of a crime, there must be some
facilitation of a crime by having a weapon.
So, even if the Court would conclude he had a
weapon, I'm not sure what crime he was
facilitating at that point.

Furthermore, for this to be a
terroristic threat, a terroristic threat is
more than just one statement.  The case law
all supports that out.  The difference between
a harassment which is a statement intended to
upset someone and a terroristic threat is
there must a degree of thought.  There must be
a degree of calculation.  There must be a
degree of advanced planning, and I don't think
that that's here.

1      **COMMONWEALTH vs. CHRISTOPHER THORPE**        35

2                        Number one, I would argue that

3      Mr. Little did not testify --

4                        MR. CURCI:  Counsel, I don't

5      mean to cut you off.  Can I call in my

6      witnesses?  I didn't know we were going

7      straight to closing.

8                        MR. WINTER:  I'm not closing.

9      This is a motion to dismiss.

10                        MR. CURCI:  I'm sorry.

11                        MR. WINTER:  So, based on that,

12     Your Honor, I don't believe they have met

13     their burden at this point.  I would ask the

14     Court to dismiss the charges.

15                        THE COURT:  Okay.  I will deny

16     the motion for now.

17                        MR. WINTER:  Okay.  Based on

18     that, I do have Christopher Thorpe to testify.

19                        THE COURT:  I just want to make

20     sure, did he waive arraignment and plead not

21     guilty?  Just to make the record technically

22     correct.

23                        COURT CRIER:  Are you going to

24     waive arraignment?

25                        MR. WINTER:  Yes, we waive

COMMONWEALTH vs. CHRISTOPHER THORPE          36

2      arraignment and plead not guilty.

3                        - - -

4                    ... CHRISTOPHER THORPE, having

5      been duly sworn, was examined and testified as

6      follows:

7                        - - -

8                    COURT CRIER:  Could you state

9      your name, sir.

10                    THE DEFENDANT:  Christopher

11     Thorpe.

12                        - - -

13                    DEFENSE'S EVIDENCE

14                    DIRECT EXAMINATION

15                        - - -

16     BY MR. WINTER:

17     Q.      Mr. Thorpe, in June of 2011, June 30th

18     specifically, where were you living, sir?

19     A.      I was at 5047 Duffield.

20     Q.      Okay.  On that day, was there a problem with

21     Mr. Little's brother Brandon that he was referring

22     to?

23     A.      Yes, there was.

24     Q.      Okay.  Can you tell the Court briefly, again

25     it's not directly relevant to what happened but can

**COMMONWEALTH vs. CHRISTOPHER THORPE**                    37

1   you tell the Court briefly what the issue was with

2   Brandon?

3   A.      My stepson was on punishment.  He should not

4   have had company in the house.  When I came

5   downstairs, Brandon was in the home playing with my

6   stepson, and I told him that he has to leave, and

7   Brandon wouldn't leave.  I said he can't have

8   company.  You have to leave.  I told him three or

9   four times, and he finally got up and shucked at me

10  and left the house.

11        And so I told my stepson, I said you know you're

12  going to be in trouble.  You're not supposed to have

13  company, and he jumped up and tried to attack me and

14  said, well, he's my friend.  He lunged at me and I

15  reflected his assault and restrained him.  Brandon

16  comes running back in the house, jumps on me and

17  starts to beat and pound on me.  Okay.  I have

18  bruises and marks.  I had to go to the hospital

19  because of the attack a few days later.  I had to

20  fight.  Both of them are jumping me and beating me.

21  I am trying to restrain them and get them off me.  I

22  finally get them off me.  I get Brandon off me and

23  they run out the back door.  I run upstairs, grab the

24  cell phone, call 911.

1       **COMMONWEALTH vs. CHRISTOPHER THORPE**       38

2       The officer that showed up was an officer that I

3 had met before, classy guy, nice guy, and he began to

4 fill out the report about what happened.  He got a

5 call about a guy with a gun, some pizza delivery guy

6 pulled up and said there was a guy with a gun.  He

7 said I will be back and he will finish out the report

8 when I take care of this.  I said great.  Thank you.

9 Q.     Just to keep the matter moving, you had been

10 assaulted by Mr. Little's brother?

11 A.     I had been assaulted by -- yes, by Brandon.

12 Q.     Did there come a point when you decided to go

13 and to see Mr. Brandon Little's mother?

14 A.     The only time -- I sat down there and waited

15 for the police officer to come back on the step for a

16 couple hours until it became nighttime and his mother

17 came home and went to go find her son because her son

18 was with Brandon.

19       So, when she went to the neighbor where they

20 were, she confronted her son about what happened

21 because she also told him that Brandon was not his

22 friend because Brandon wants for him what he has for

23 himself, nothing.  Okay.  He comes from a really bad

24 family.  So, Brandon tried to assault my wife and the

25 neighbor, who is a friend, had to get in between and

COMMONWEALTH vs. CHRISTOPHER THORPE          39

1

2  grab Brandon and pin him to the wall so that my wife

3  can get out of the house so she could escape.

4      She came down the street stumbling, came to me.

5  I said, what happened?  I said, no.  You know I'm

6  sitting here waiting for the police officer to come

7  back because of what happened.  No one's here yet.

8  At least we got to tell their mother.  We're going to

9  the mother.  She said, I'll be right there.  We're

10 going to talk and see if we can have a conversation

11 with the parent, parent to parent so that we can

12 talk.  I go up to the house and I said, are you okay?

13 She said, yeah.  I'm going to go talk to the mother.

14 Okay.  At least maybe we can get some kind of

15 resolution.  So, I go up to the house and I say where

16 is your mother and brother.

17 Q.      Just so we're clear at this point, who did you

18 encounter when you went to the home?

19 A.      I encountered Billy.

20 Q.      William who testified earlier in the day?

21 A.      Right.

22 Q.      Okay.

23 A.      And he asked me, he said, what do you want?  I

24 said I want to talk to your family.  I said you

25 guys -- I said especially you.  I said you're running

COMMONWEALTH vs. CHRISTOPHER THORPE                40

1
2    around the streets.  You're fighting.  You're
3    stealing your mother's car at night when she's
4    asleep.  Okay.  You don't have a license, and now
5    you're selling drugs.  Okay.  I mean, what in the
6    world is wrong with you guys.  I said, no.  I want to
7    talk to your mother.  F you, screw you, screw that,
8    do this.  I said, yeah.  Okay.  Whatever.  Look, I
9    want to talk to your mother because we're going to
10   get to the bottom of this.  We're going to resolve
11   this.  Screw you.  He pulls out his phone.  He says,
12   you know what mother effer, you see this phone.  One
13   phone call and I'll have you murdered.  I said
14   murdered.
15   Q.    And this was all William Little saying this?
16   A.    Yes.
17   Q.    Okay.  Murdered.  Now, I've come out of my
18   pocket on many occasion because the mother has
19   issues.  She doesn't feed the kids.  She doesn't do
20   anything for them.  She has DHS investigations, drug
21   use, and they come to my house saying we have nothing
22   to eat, my doesn't cook and there's no food.
23                 MR. CURCI:  Your Honor, I object
24            to that.  I mean, this is all hearsay him
25            talking about DHS with the mom and all the

1    COMMONWEALTH vs. CHRISTOPHER THORPE          41

2              other stuff that he was saying.

3                        THE COURT:  Sustained.  I'll

4         leave out that hearsay.

5                        MR. WINTER:  Okay.

6    BY MR. WINTER:

7    Q.        Focus on specifically what did you say to

8    Mr. Little on that evening?

9    A.        When he said he was going to have me murdered,

10   I was outraged.  Murdered.  Murdered.  You know,

11   after doing what I have done for the family,

12   murdered.  You're going to murder me.  You and who?

13   And so then it became, screw you.  Go pound sand.

14   Whatever.  So, I started walking back down the

15   street.

16        So, the mother and Brandon finally come outside.

17   They're screaming at me.  Yeah, walk on back down the

18   street you mother fucker.  Yeah.  Yeah.  And I'm

19   like, you know what, this is why you're in the

20   position that you're in.  And I did, I called the

21   mother a crack head.  Both the parents are drug

22   addicts.  I said your parents are crack heads, and

23   that's why you're in the position socially that

24   you're in right now.  Okay.  And you're not going to

25   pound on me because Brandon and Billy also beat their

**COMMONWEALTH vs. CHRISTOPHER THORPE**          42

1
2      stepfather before he died.
3                          MR. CURCI:  Objection.
4              Objection.
5                          THE COURT:  Sustained.
6      BY MR. WINTER:
7      Q.     Again, you have to focus on what was said that
8      night.
9      A.     Okay.  Well, that's when I told them, I said
10     you're not going to do to me and my family what you
11     did to Jamal.  You know, he was a highly --
12                         MR. CURCI:  Objection.  It's
13             irrelevant.
14                         THE COURT:  Well, it's what this
15             witness said.  I'll sustain it as to all the
16             hearsay that's coming from the speaker.
17     BY MR. WINTER:
18     Q.     Sir, you ultimately walked away.
19     A.     I walked away.  I went back down the street
20     and I just clowned with him and went home.
21     Q.     And the police were subsequently called that
22     night?
23     A.     Yes.
24     Q.     Okay.  Just so we're clear on this, at any
25     point did you pull a gun on William Little?

1      COMMONWEALTH vs. CHRISTOPHER THORPE          43

2      A.      I never pulled a gun.  As a matter of fact,

3      for a lot of my adult life I worked in a gun shop.  A

4      friend of mine owned a gun shop.  I taught in my

5      spare time firearm safety.  I've gone out of my way

6      to safe guard any firearms that I do own.

7          You know, this is just ridiculous.  I had an

8      argument with people who assault me, and I tried to

9      as an adult -- I didn't grow up in Philadelphia.  I

10     grew up in Montgomery County.  I went to Cheltenham.

11     You know, it's a completely different social

12     environment.  If you have a problem with a child, you

13     try to resolve it with a parent and that's what I

14     attempted to do.  Okay.  So, he wanted to have me

15     murdered.  Okay.  So, you know what, forget you.  I'm

16     going home.

17     Q.      Sir, did you threaten William Little on that

18     evening?

19     A.      No.

20     Q.      Did you tell William Little that you were

21     going to pop a cap in him?

22     A.      I don't speak that way.  Pop a cap.  No one

23     said that since '89.  I mean, this is ridiculous.

24     Pop a cap.  I mean, who pops a cap.

25     Q.      Sir, the firearms that were seized from you by

1          **COMMONWEALTH vs. CHRISTOPHER THORPE**          44

2     police, did you lawfully possess all those firearms?

3     A.      Yes, I did.

4     Q.      Okay.  Do you have any criminal record that --

5     A.      No, none.  Some traffic violation, red light,

6     you know.

7                         MR. WINTER:  I believe that's

8          all I have for Mr. Thorpe at this time.

9                         - - -

10                   CROSS-EXAMINATION

11                        - - -

12    BY MR. CURCI:

13    Q.      When you walked over there to talk to them,

14    you had one of your guns on you; is that right?

15    A.      No.

16    Q.      So, when you talked to the officer --

17    A.      What I had here was my -- no, that's where we

18    have contention with him because I told him that I

19    owned firearms.  I have a valid permit to carry but I

20    didn't have a gun on me.  What I had on my right hip

21    here was my cell phone, okay, in a case that I keep

22    clipped to my side.  Yes, a cell phone.

23    Q.      In a gun holster.

24    A.      No, I do have a gun holster.  I do have a

25    permit to carry.

COMMONWEALTH vs. CHRISTOPHER THORPE                45

1

2    Q.    But you weren't wearing it that day?

3    A.    No.

4    Q.    Okay.  So, when Officer Hosgood stood here and

5    testified that you told him you had an argument and I

6    had my gun on me.

7    A.    No, I did not say that.

8    Q.    He was wrong about that?

9    A.    Yes.

10    Q.    That's what he said you said?

11    A.    No, he's wrong.  He's wrong because they know

12    that I am hot.  There has been a violation of state

13    law and my permit to carry.  There has been a

14    violation of my civil rights, my constitutional

15    rights.

16    Q.    All right, sir.  I didn't ask you about your

17    constitutional rights.  I have another question for

18    you.

19    A.    That's fine.

20    Q.    When they stopped you, you had .9 millimeter

21    bullets or clips in your back pocket; is that right?

22    A.    No, not in my back pocket.  That's another

23    inconsistent statement.  I had the magazines in a

24    magazine carrier on my belt.  Okay.

25    Q.    So, you had the magazines on you but you

COMMONWEALTH vs. CHRISTOPHER THORPE                46

1
2    didn't have on a holster instead you actually had a
3    cell phone in a holster not magazine clips?
4    A.      No, not in a holster in a carrier --
5    Q.      Is that what you're saying?
6    A.      -- a cell phone carrier, and the magazines --
7    do you know what that's like changing your pants
8    everyday and putting -- sometimes I'll have these
9    jeans on for two or three days and the same belt and
10   the same carrier on that belt on my side and you just
11   take off the firearm.  I'm not going to sit there and
12   take off everything, take off the firearm and secure
13   the firearm.  If the magazines are on me when I go
14   outside the house, all I have to do is put the
15   firearm into the holster and go on about my business.
16   Q.      So, is that what you usually do when you're
17   outside the house, you put the firearm into your
18   holster?
19   A.      No.  If I'm going to the store, if I'm leaving
20   my block, if I'm going somewhere and I have a valid
21   state issue permit to carry, then yeah.  I'll put the
22   firearm in my holster and leave.  I'm sitting on my
23   porch waiting for the police officers to come back
24   which he said he would and I believed him because he
25   proved reliable.

1          COMMONWEALTH vs. CHRISTOPHER THORPE          47

2     Q.     All right.  Just answer the questions that I

3     ask.

4     A.     What's that?

5     Q.     When you go out --

6     A.     Yes.

7     Q.     -- you put that firearm in the holster; is

8     that right?

9     A.     When I leave the --

10    Q.     That's what you just said, right?

11    A.     When I leave the block.

12    Q.     When you leave the block?

13    A.     Not when I went up the street.  Look, these

14    guys were friends of the family.

15    Q.     All right.  Sir, I'm asking you simple

16    questions and you're giving very long answers.

17    A.     I'm telling you --

18                    MR. WINTER:  All right.  Just

19          answer the question.

20                    THE WITNESS:  When I leave the

21          house, if I am leaving the block and going

22          somewhere away from home, I will put on my

23          firearm because I have a valid state issue

24          permit to carry.  There's no stipulation that

25          says what time of the day that I can wear or

1       **COMMONWEALTH vs. CHRISTOPHER THORPE**        48

2       not wear.

3                       MR. CURCI:  Your Honor, I have

4       no further questions for the witness.

5                       MR. WINTER:  That's all I have

6       for today.

7                       THE COURT:  Okay.  You both

8       rest?

9                       MR. WINTER:  Yes.

10                      MR. CURCI:  Yeah.

11                      THE COURT:  Okay.  Any argument

12      here?

13                          - - -

14                  (Argument heard.)

15                          - - -

16                      THE COURT:  Not guilty.  Done.

17      We're done.  Okay.

18                          - - -

19                  (Hearing concludes.)

20                          - - -

21

22

23

24

25

1                                                    49

2                        CERTIFICATE

3

4               I HEREBY CERTIFY THAT THE

5       PROCEEDINGS AND EVIDENCE ARE CONTAINED FULLY

6       AND ACCURATELY IN THE NOTES TAKEN BY ME ON THE

7       TRIAL OF THE ABOVE CAUSE, AND THIS COPY IS A

8       CORRECT TRANSCRIPT OF THE SAME.

9

10                      MELISSA BELMONT

11                      COURT REPORTER

12

13               (THE FOREGOING CERTIFICATION OF

14      THIS TRANSCRIPT DOES NOT APPLY TO ANY

15      REPRODUCTION OF THE SAME BY ANY MEANS UNLESS

16      UNDER THE DIRECT CONTROL AND/OR SUPERVISION OF

17      THE CERTIFYING REPORTER.)

18

19

20

21

22

23

24

25

Exhibit D

27959
LD

FILE COPY

Commonwealth of Pennsylvania
Court of Common Pleas
County of Philadelphia
1st Judicial District

**NOTICE OF
MOTIONS HEARING**

In Re: Thorpe, Christopher

Court of Common Pleas - Philadelphia County
Active Criminal Records Department

Ph

**RECEIVED**
6-12-12

Docket No: CP-51-MD-0005704-2012

You are hereby DIRECTED to appear for a/an Motions Hearing in the above-captioned case to be held on/at:

| Date: July 09, 2012 | Location: 478 |
| --- | --- |
| Time: 9:00 AM | City Hall |
| | Broad and Market Streets |
| | Philadelphia, PA 19107 |

**To the Defendant:**

**You should discuss this matter promptly with your attorney. If you fail to appear as required or comply with the conditions of the bail bond, if any, then the bond shall remain in full force, and the full sum of the monetary condition of release may be forfeited and your release may be revoked. In addition, a warrant for your arrest may be issued. Bring this notice with you.**

**If you are disabled and require a reasonable accommodation to gain access to the Philadelphia County Court of Common Pleas and its services, please contact the Philadelphia County Court of Common Pleas at the above address or telephone number. We are unable to provide transportation.**

I, the undersigned, acknowledge receipt of this notice.

_____
Signature of Recipient (File Copy)

_____
Date Received

Primary Participant Name and Address:
Thorpe, Christopher
7913 Newbold Lane
Laverock, PA 19038

AOPC 2070 REV. 04/11/2012

Printed: 06/07/2012 2:21PM



Commonwealth of Pennsylvania
First Judicial District of Pennsylvania
County of Philadelphia
1st Judicial District

# RECEIPT

Receipt Number: 51-2012-R150157
Recorded Date: 06/07/2012 02:18PM
Receipt Date: 06/07/2012

**Payor:**   Christopher Thorpe
      7913 Newbold Lane
      Laverock, PA 19038

**Payable to:** First Judicial District of PA
      Attn: Accounting Unit
      1401 Arch Street, 1st Floor
      Philadelphia, PA 19102



RECEIVED
8-13-12

**Payment Source:** Mail

| Payment Date | Payment Method | Check / Money Order Number | Bank Transit Number | Void | Payment Amount |
|---|---|---|---|---|---|
| 06/07/2012 | Money Order | 20072823221 | | No | $25.00 |

**Responsible Participant:** Christopher Thorpe

   *Docket Number: CP-51-MD-0005703-2012*      *Short Caption: In Re: Thorpe, Christopher*

Total Amount Owed by Responsible Participant on this case:        $0.00

Total Amount Owed by Responsible Participant on all non-archived cases in this Court:    $0.00

**Payment Summary:**

| | | |
|---|---|---|
| *Total Payment Received:* | $ | 25.00 |
| *Change Amount:* | $ | 0.00 |
| *Retained Unapplied Amount:* | $ | 0.00 |
| **Payments Less Change:** | **$** | **25.00** |

**Comments:**

### RETAIN THIS RECEIPT FOR YOUR RECORDS

You can now make case payments online through Pennsylvania's Unified Judicial System web portal. Visit the portal at
*http://ujsportal.pacourts.us/epay* to make a payment and learn more. Currently, ePay is only available for Criminal
and Summary Appeal docket types.

AOPC 128 - 2012 REV. 06/07/2012                               06/07/2012   2:18:23PM

Exhibit E

27959
EF



JUN 0 7 2012

ACTIVE CRIMINAL RECORDS
CRIMINAL MOTION COURT

## IN THE COURT OF COMMON PLEAS
### FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

PETITIONER'S NAME _CHRISTOPHER   DANTE   THORPE_

ADDRESS _7913  NEWBOLD  LANE_

CITY _LAVEROCK,_                     STATE _PA._      ZIP _19038_

PHONE NUMBER _215-233-1792_

VEHICLE IDENTIFICATION NUMBER _____ _N/A_ _____
                                          _Dkc. NO. 11-155-06617_

COMMONWEALTH OF PENNSYLVANIA        :    CASE NUMBER: _MC-51-CR-00 28 183-2011_
EX REL. _Christopher  Dante  Thorpe_

(Name of Party in the Court)

                                              _271238_
              VS.                 :    Police Photo#: _271388_ ✓
                                              _271286_

PHILADELPHIA POLICE DEPARTMENT
POLICE COMMISSIONER              :     Motions No: _____

## ORDER

AND NOW, to wit, this _25th_ day of _October_, 20_12_,
upon consideration of the within Petition, it is hereby ORDERED AND DECREED that the property
_2 GUNS +AMMO_ _____, listed on Property Receipt No _8976525_
be returned to the above named Petitioner forthwith.

BY THE COURT:

_____ J.

2

Exhibit F

27959
EF



RECEIV
10-26-12

JUN 0 7 2012

ACTIVE CRIMINAL RECORDS
CRIMINAL

## IN THE COURT OF COMMON PLEAS
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA

PETITIONER'S NAME  *CHRISTOPHER   DANTE   THORPE*

ADDRESS  *7913   NEWBOLD   LANE*

CITY  *LAVEROCK,*                    STATE  *PA*    ZIP  *19038*

PHONE NUMBER  *215-233-1792*

VEHICLE IDENTIFICATION NUMBER _____ *N/A* _____
                                   *Doc# A-155-066017*

COMMONWEALTH OF PENNSYLVANIA    :    CASE NUMBER: *MC-51-CR-0028183-2011*
EX REL. *Christopher Dante Thorpe*

    (Name of Party in the Court)

      VS.                        :    Police Photo#:  *271238*
                                                  *271286*
PHILADELPHIA POLICE DEPARTMENT                    *271388*
POLICE COMMISSIONER             :    Motions No: _____

## O R D E R

    AND NOW,  to wit, this  **25ᵀᴴ**  day of  *OCTOBER*  20**12**,
upon consideration of the within Petition, it is hereby ORDERED AND DECREED that the property
*#2 GUN & AMMO*         , listed on Property Receipt No. *2946526*
be returned to the above named Petitioner forthwith.

                BY THE COURT:

                                J.

Exhibit G

Exhibit H

